**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

VERNA A. MARSHALL                                                                        PLAINTIFF

V.                                            NO. 4:11CV00228-JTR

MICHAEL J. ASTRUE,                                                                       DEFENDANT
Commissioner, Social
Security Administration

**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Verna A. Marshall, has appealed the final decision of the Commissioner of the Social Security Administration denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Both parties have filed Appeal Briefs (docket entries #14, #15), and the issues are now joined and ready for disposition.

The Commissioner's denial of benefits must be upheld upon judicial review if the decision is supported by substantial evidence in the record as a whole. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Moore*, 623 F.3d at 602.

On March 19, 2007, Plaintiff protectively filed applications for DIB and SSI.

alleging a disability onset date of September 6, 2006. (Tr.114-20, 126.) She later amended the onset date to May 12, 2007. (Tr. 23-24.) She reported that she was unable to work due to: lower lumbar pain, depression and anxiety. She said she had problems sitting or standing in one spot more than twenty minutes at a time, had "excruciating pain," and had been "depressed to the point where [she had] tried to take [her] own life ... [or] felt like [she] might hurt someone." (Tr. 131.) She was fifty-one years old at the time of her alleged disability onset, had completed high school, and had past work as telemarketer, administrative assistant, and clerical/office worker. (Tr. 55-56, 125, 132, 137, 150-56.)

After Plaintiff's claims were denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge (ALJ). On October 15, 2009, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 20-61.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b). If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*

Step 2 involves a determination, based solely on the medical evidence, of

whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.* §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c). If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment, which is presumed to be disabling. *Id.* §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d). If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has a sufficient residual functional capacity (RFC), despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.* §§ 404.1520(a)(4)(iv) & (f), 416.920(a)(4)(iv) & (f). If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given the claimant's RFC, age, education and work experience. *Id.* §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g). If so, benefits are denied; if not, benefits are awarded. *Id.*

In his January 4, 2010 decision (Tr. 8-14), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since May 12, 2007, her alleged onset date; (2) had "severe" impairments of degenerative disc disease of the lumbar spine,

personality disorder, and post-traumatic stress disorder (PTSD); (3) did not have an impairment or combination of impairments that met or equaled a listed impairment; (4) had the RFC for a wide range of unskilled, medium exertional work, *i.e.*, lifting up to fifty pounds occasionally and twenty-five pounds frequently, and sitting or standing/walking up to six hours each in an eight-hour workday; and performing work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote with few variables and little judgment, and supervision required is simple, direct and concrete; (5) was not fully credible regarding her subjective allegations of pain and limitation as they affect her ability to work; (6) was unable to perform her past relevant work; but (7) considering her age, education, work background and RFC, and based on the testimony of the vocational expert, was able to perform other jobs that exist in significant numbers in the economy. Thus, the ALJ concluded that Plaintiff was not disabled.

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-3.) Plaintiff then appealed the denial of benefits to this Court (docket entry #2).

## II. Analysis

Plaintiff argues that the ALJ's RFC determination is not supported by

substantial evidence or based upon proper application of the law because the ALJ: (1) failed to properly consider all medical evidence regarding Plaintiff's mental impairments; (2) improperly assessed the credibility of her subjective complaints; (3) improperly found that she had the ability to perform sustained work activities; and (4) improperly found that she was able to perform work at the medium exertional level. For the reasons discussed below, the Court concludes that Plaintiff's arguments regarding the ALJ's evaluation of her mental impairments are meritorious, necessitating reversal and remand.[1]

In overlapping arguments, Plaintiff contends that, in formulating the mental RFC assessment, the ALJ erred: by inaccurately and incompletely summarizing the medical evidence of Plaintiff's mental health treatment, which included numerous low Global Assessment of Functioning (GAF) scores[2] and extensive clinical notes and opinions from her treating psychiatrists; by failing to determine whether noncompliance with medication and medical appointments was due to her mental impairments; and by finding that she was able to maintain sustained employment in light of her history of mental health treatment.

---

[1] Under these circumstances, the Court need not address Plaintiff's other arguments for reversal.

[2] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009).

Although an ALJ is "not required to discuss every piece of evidence submitted," *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010), he is required to "consider *all* evidence" in the case record, 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3) (emphasis added). Moreover, an ALJ must "always give good reasons" for the weight he gives to the opinions of a claimant's treating physicians. *Id.* §§ 404.1527(d)(2), 416.920(d)(2). This includes medical opinions about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what a claimant is capable of doing despite the impairment, and any resulting restrictions. *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Generally, more weight is afforded to the opinions of examining and treating medical sources than those of non-examining sources. *Id.* §§ 404.1527(d)(1) & (2), 416.927(d)(1) & (2).

In his decision, the ALJ noted that Plaintiff had a "history of mental health treatment," with diagnoses of PTSD and personality disorder by a treating psychiatrist and by a consultative psychologist. (Tr. 10.) He found that her mental symptoms were "likely exacerbate[d]" by substance abuse and noncompliance with medication and medical appointments. (Tr. 10-11.) In assessing Plaintiff's mental RFC, the ALJ adopted the findings of a reviewing, non-examining state agency psychiatrist who reviewed her medical records and opined that she could perform unskilled work. The ALJ noted that this state agency opinion was "consistent with the evidence in the

6

record, which shows a global assessment of functioning score above 50 when the claimant is compliant with her medication." (Tr. 12.)

This truncated discussion does not fully and accurately reflect the extent of Plaintiff's mental impairments and does not demonstrate that the ALJ fulfilled his responsibilities under the regulations for evaluating those impairments.

Between April 2005 and June 2009, Plaintiff had twenty consultations or evaluations with mental health professionals at Little Rock Community Mental Health Center (LRCMHC), including Muhammad Raza, M.D., James Parks, M.D., John Schay, M.D., and Alan Bagley, M.D. (Tr. 200-03, 207-14, 297-307, 334-68.) She also underwent mental diagnostic evaluations by two psychological consultants: (1) James R. Moneypenny, Ph.D./Psychologist, on July 16, 2007 (Tr. 256-61); and (2) George M. DeRoeck, Psy.D., on October 19, 2007 (Tr. 265-71).

During the most relevant period, June 2007 and June 2009, Plaintiff regularly attended LRCMHC appointments, about once a month, without any significant breaks in treatment. She reported multiple problems, including: feelings of depression, hopelessness and guilt; inability to sleep; low energy and poor concentration; nightmares about a rape suffered years ago; auditory and visual hallucinations, including voices telling her to kill herself; discomfort in groups of people; memory difficulties; and paranoia. Clinical notes also indicate that she attended group therapy

at times, but stopped going because of increased discomfort in groups of people. (Tr. 39-40, 298, 335, 363).

Plaintiff's treating and examining physicians diagnosed her with: major depressive disorder, recurrent, moderate to severe, with and without psychotic features; PTSD; personality disorder with Cluster B and borderline traits; psychosis NOS; and rule out bipolar disorder, bulimia and schizophrenia. (Tr. 201, 207, 211, 260, 270, 297-98, 299-300, 301-02, 304-05, 306-07, 335, 337, 339, 341, 344, 347, 350, 353, 356, 358, 361, 364.) From June 2007 to June 2009, she was continuously prescribed anti-depressant and anti-psychotic medications, including Lexapro, Trazodone, Seroquel, Risperdal, Abilify, Geodon and Prazosine. (*E.g.*, Tr. 180, 366-67.)

Plaintiff's mental health providers assigned her the following GAF scores:

        April 19, 2005     GAF 49     (Tr. 211)
        Sept. 29, 2006    GAF 35     (Tr. 202)
        June 18, 2007     GAF 35     (Tr. 307)
        July 16, 2007     GAF 35-45 (Tr. 260)
        July 27, 2007     GAF 49     (Tr. 305)
        Aug. 24, 2007    GAF 45     (Tr. 302)
        Sept. 28, 2007   GAF 51     (Tr. 300)
        Oct. 19, 2007    GAF 42     (Tr. 270)
        Nov. 16, 2007    GAF 51     (Tr. 298)
        Jan. 29, 2008    GAF 41     (Tr. 364)
        Feb. 26, 2008    GAF 41     (Tr. 362)
        March 25, 2008  GAF 45     (Tr. 358)
        Apr. 29, 2008    GAF 41     (Tr. 356)
        June 10, 2008    GAF 41     (Tr. 353)

      July 22, 2008        GAF 43      (Tr. 350)
      Aug. 19, 2008       GAF 43      (Tr. 347)
      Sept. 16, 2008     GAF 43      (Tr. 344)
      Nov. 25, 2008      GAF 45      (Tr. 341)
      Jan. 21, 2009       GAF 45      (Tr. 339)
      Mar. 23, 2009      GAF 45      (Tr. 337)
      June 16, 2009       GAF 45      (Tr. 335)

A GAF score of 31 to 40 indicates an individual has an "impairment in reality testing or communication ... or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood"; a GAF of 41 to 50 represents "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning"; and a GAF of 51 to 60 represents "[m]oderate symptoms ... or moderate difficulty" in functioning. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000).

      The ALJ's general reference to a "history of mental health treatment" does not show that he considered all of the evidence of record. Significantly, he only referred to PTSD and personality disorder (Tr. 10, 13), without mentioning Plaintiff's repeated diagnoses of major depressive disorder or her treating physicians' observations of recurring depressive and psychotic symptoms. He referred to one GAF score above 50 in September 2007 (Tr. 12), but failed to mention the existence of nineteen other scores in a four-year period which were between 35 and 49, representing serious or major impairments in functioning.

9

The Commissioner's Appeal Brief acknowledges that the ALJ did not evaluate the numerous instances where Plaintiff's GAF scores were below 50, but downplays the significance of those scores. However, the Eighth Circuit has held that a lengthy history of low GAF scores like those in Plaintiff's mental health records warrants a closer look at the extent of a claimant's functional limitations due to mental impairments. *See Pate-Fires*, 564 F.3d at 944-45 (RFC findings not supported by substantial evidence where, among other things, claimant's GAF score was above 50 only four out of twenty-one times in a six-year period); *Conklin v. Astrue*, 360 F. App'x 704, 707 (8th Cir. 2010) (RFC findings not supported by substantial evidence where claimant suffered from anxiety and depression, with GAF ratings between 35 and 40); *see also Jones v. Astrue*, 619 F.3d 963, 972-74 & n.4 (8th Cir. 2010) (distinguishing from *Pate-Fires* because claimant did *not* have lengthy history of low GAF scores and ALJ explained why he was discrediting findings of claimant's mental health providers); *Halverson v Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) (permissible for ALJ to decline to rely on 40 GAF when dozens of earlier examinations indicated GAF scores between 52 and 60).

Additionally, the ALJ did not mention – much less discuss – opinions from two of Plaintiff's treating physicians at LRCMHC. On February 26, 2008, Dr. Schay stated, "[I]n my opinion at this time based on the severity of her depressive and

psychotic symptoms, [Plaintiff] will have a very difficult time working in any public sector job" and will "require reassessment prior to starting work in order to determine whether she would be able to work in the future." (Tr. 361.)[3] On January 21, 2009, Dr. Bagley certified that Plaintiff met the diagnostic criteria for "a serious mental illness" which "resulted in functional impairment ... substantially interfering with or limiting one or more major life areas" (Tr. 339, 368), and he reiterated this conclusion twice more, on March 23 and June 16, 2009 (Tr. 335, 337).

The only specific medical findings cited by the ALJ to support his mental RFC determination were those of a non-examining, non-treating state agency medical consultant, Jay Rankin, M.D. Based solely on his review of Plaintiff's medical records, Dr. Rankin completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review form on November 19, 2007. (Tr. 275-92.) After checking various boxes, he found – without elaboration or explanation – that Plaintiff was "able to perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)." (Tr. 291.)

---

[3]Dr. Schay saw Plaintiff eight times at LRCMHC for her mental health symptoms. (Tr. 340-57, 360-64.)

The ALJ failed to adequately explain why he chose to credit this state agency opinion over the conflicting opinions of Plaintiff's treating mental health physicians, which were supported by contemporaneous clinical notes and GAF scores showing serious functional limitations. Furthermore, the state agency opinion was based on a review of Plaintiff's medical records through, at the latest, November 2007. After that date, Plaintiff received mental health treatment at LRCMHC at least twelve more times, through June 2009.

Finally, the ALJ placed too much emphasis on evidence of Plaintiff's noncompliance with medication and treatment without discussing whether her noncompliance was due to her mental impairments, rather than willful conduct. *See Pate-Fires*, 564 F.3d at 946 (relevant question for ALJ to resolve is whether failure to follow prescribed treatment was a manifestation of claimant's mental disorder). After one of Plaintiff's treating physicians explained to her in June 2007 that noncompliance with medication and psychiatric follow-up was a perpetuating factor for her depressive symptoms (Tr. 307), Plaintiff was substantially compliant with her medications and she attended appointments about once a month for almost two years.[4]

---

[4] LRCMHC records indicate that, during this time period, Plaintiff cancelled or rescheduled four appointments and did not show for four other appointments and two group sessions. (Tr. 365.) In contrast, she kept seventeen mental health treatment appointments, plus two consultative evaluations and some group therapy.

She nevertheless continued to report fluctuating symptoms and functional difficulties, which are supported in part by the low GAF scores noted above and by her treating physician's certifications that she continued to meet the criteria for serious mental illness. In February 2008, her treating physician, Dr. Schay, noted a worsening of psychotic and depressive symptoms which he stated was "likely due to noncompliance with medication" but could have been due to a recent switch in her prescription. (Tr. 361.) His clinical notes state that Plaintiff endorsed "memory difficulties," was "confused" about the medication instructions at her last appointment, and specifically asked to have the instructions written down in order to improve compliance. (Tr. 360.) Dr. Schay stated that Plaintiff's noncompliance "may be a product of memory difficulties versus poor judgment." (Tr. 361.)

The Court agrees that Plaintiff has some credibility issues due to her inconsistent statements regarding her use of cocaine, marijuana and alcohol. (*See* Tr. 10, 13.) "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record," including statements made by the claimant at each prior step of the administrative review process. SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996). Furthermore, the failure to abstain from drugs and alcohol as directed by her physicians is a valid reason for discrediting a claimant's subjective complaints. *Wildman*, 596 F.3d at 968-69.

Nevertheless, the ALJ is still required to perform a proper and complete analysis of the extensive evidence of Plaintiff's mental health treatment.

### III. Conclusion

The Court concludes that the record in this case fails to contain substantial evidence to support the ALJ's assessment of Plaintiff's mental RFC or his Step 5 determination that there are jobs in the national economy which Plaintiff is capable of performing. On remand, the ALJ should ensure that he considers and sufficiently discusses the medical evidence of Plaintiff's mental health treatment, including her low GAF score history and the diagnoses, reports and opinions of her treating mental health physicians. He should identify sufficient medical evidence to support his mental RFC assessment. He should determine whether any noncompliance can be attributed to Plaintiff's mental impairments. Further, he should ensure that he includes all credible impairments and limitations in the RFC assessment and in his hypothetical question to the vocational expert.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is **reversed** and this matter is **remanded** to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED THIS 23rd DAY OF January, 2012.

_____
UNITED STATES MAGISTRATE JUDGE